**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:**<br><br>**COOPER-BOOTH WHOLESALE COMPANY, L.P.**<br><br>**Debtor** | : | **CHAPTER 11**<br><br>**BANKRUPTCY NO. 13-14519(MDC)** |
| **In re:**<br><br>**COOPER-BOOTH TRANSPORTATION COMPANY, L.P.**<br><br>**Debtor** | : | **CHAPTER 11**<br><br>**BANKRUPTCY NO. 13-14521(MDC)** |
| **In re:**<br><br>**COOPER-BOOTH MANAGEMENT COMPANY, INC.**<br><br>**Debtor** | : | **CHAPTER 11**<br><br>**BANKRUPTCY NO. 13-14522(MDC)** |

**DECLARATION OF BARRY MARGOLIS CHIEF EXECUTIVE OFFICER OF THE DEBTORS IN SUPPORT OF FIRST DAY MOTIONS**

I, Barry Margolis, hereby declare under penalty of perjury:

1. I am the President of Cooper-Booth Management Company, Inc. (the "**Management Debtor**") a debtor and debtor in possession in the above captioned Chapter 11 cases. The Management Debtor is the corporate general partner of Cooper Booth Wholesale Company L.P. (the "**Wholesale Debtor**") and Cooper-Booth Transportation Company, L.P. (the "**Transportation Debtor**"), each a debtor and debtor-in-possession in the above captioned Chapter 11 cases (the Management Debtor, the Wholesale Debtor and the Transportation Debtor are collectively referred to as the "**Debtors**"). In this capacity, I am generally familiar with the Debtors' day to day operations, businesses and financial affairs, and books and records.

2. On May 21, 2013 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the"**Bankruptcy Code**"). The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this declaration (the "**Declaration**"), the Debtors have sought procedural and joint administration of these chapter 11 cases.

3. To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 case on their businesses, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "**First Day Motion**"). The First Day Motions seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

4. I am familiar with the contents of each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration describes the Debtors' businesses, their capital and corporate structures and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

**BACKGROUND**

A. **Commencement of Chapter 11 Cases**

6. On the Petition Date, each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Declaration, the Debtors have sought procedural and joint administration of these chapter 11 cases.

B. **The History of the Debtor's Business**

7. The Cooper Booth Debtor has been in the wholesale distribution business since 1865 when the Booth Tobacco Company was incorporated in Lancaster, Pennsylvania. It continued to grow with the acquisition of Cooper Tobacco and a number of other distributers over the years. Family owned and operated for three generations, the company's longevity has been made possible by providing its customers with the best service and value available.

8. The company serves the Mid-Atlantic region and is recognized as one of the top twenty convenience store wholesalers in the country.

C. **The Debtor's Business**

9. I have served as the President of the Management Debtor since 2002 and I am the sole shareholder of the Management Debtor. The Management Debtor and I own all of the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

partnership interests of the Wholesale Debtor and all the partnership interests in the Transportation Debtor are owned by the Wholesale Debtor and the Management Debtor.

10. I have been involved in the convenience store wholesale cigarette distribution business for over 22 years and have worked with the Debtors since 1990.

11. Cooper Booth's main supplies are cigarettes, snacks, beverages, and other food items typically found in convenience stores (such as coffee, candy, condiments, household items). These are procured from both national and regional suppliers including Hershey's, Kellogg's, Bic, and Mars.

12. The consolidated Debtors income statement from 2009 through 2012 is attached hereto as **Exhibit "A"** and made a part hereof.

13. As of May 18, 2013, the Debtor's assets consisted of cash of approximately $700,000; cash in the garnished account at PNC Bank of $2.1 million; accounts receivable of approximately $28.3 million (excluding bad debt allowances); inventory of approximately $23.1 million (FIFO); prepaid expenses and other current assets of approximately $1.9 million, equipment of $5.8 million, and other assets of approximately $500,000.

**D. The Debtors' Corporate Structure**

14. The Management Debtor is a Pennsylvania corporation. I am the sole shareholder of the Management Debtor. The Management Debtor holds a 2% general partnership interest in the Wholesale Debtor and a 1% general partnership interest in the Transportation Debtor. The Wholesale Debtor is the 99% limited partner of the Transportation Debtor, which was formed for the purpose of owning the tractors and trailers that are used in the distribution of the products of the Wholesale Debtor. The Transportation Debtor operates solely for the benefit and exclusive use of the Wholesale Debtor.

15. The Management Debtor also owns a 1% interest in Bardon Development (the "**Real Estate Company**") and I own a 99% interest in the Real Estate Company. I am the managing partner of the Real Estate Company. The Real Estate Company owns and leases to the Wholesale Debtor the real property located at 200 Lincoln West Drive, Mountville, PA 17554, which is utilized by the Wholesale Debtor as its corporate offices and distribution center.

**E. The Debtors' Capital Structure**

16. As of the Petition Date, the Debtors' total consolidated funded senior debt obligations were approximately $10.7 million and consisted of, among other things, a revolving line of credit facility, a line of credit for the purchase of equipment, and a corporate VISA Card. The major components of the Debtors consolidated funded debt obligations are described in greater detail below.

17. Line of Credit Facility. On August 30, 2011, the Wholesale Debtor entered into that certain Letter Agreement with PNC Bank, National Association ("**PNC**"), providing for a line of credit facility (the "**Line of Credit Facility**") of up to $15,000,000.00 (the "**Maximum Amount**"). Pursuant to a series of amendments, the Line of Credit Facility has been extended and modified as amended, supplemented or modified from time to time, the latest dated December 6, 2012. The Line of Credit Facility currently provides that PNC will advance an amount at any time outstanding not to exceed in the aggregate the Maximum Amount of (a) $15,000,000 for the period commencing December 1st through March 1st of each year in which PNC makes the Line of Credit Facility available to Wholesale, and (b) $10,000,000 for the period commencing March 2nd through and including November 30th of each year in which PNC makes the Line of Credit Facility available to the Wholesale Debtor. As of the May 16, 2013, outstanding principal obligations under the Line of Credit Facility were $7,721,731.

18. Equipment Finance Loan. On December 20, 2012, the Wholesale Debtor and the Transportation Debtor executed and delivered to PNC Equipment Finance, LLC ("**PNCEF**") that certain Loan and Security Agreement (the "**Equipment Loan Facility**"), subject to the conditions set forth therein, to make a loan or loans to be used for the purpose of acquiring personal property used in the operation of the Debtors' businesses. On December 20, 2012 an advance was made pursuant to a Request for Advance in the original principal amount of $1,078,444.00 (the "**1st Staged Advance**"). Another advance was made pursuant to a Request for Advance in the original principal amount of $353,460.00 (the "**2nd Staged Advance**"). On May 13, 2013 an advance was made pursuant to a Request for Advance in the original principal amount of $1,468,710 (the "**3rd Staged Advance**"). As of the Petition Date, outstanding principal obligations under the Equipment Loan Facility were approximately $2,828,718.

19. Corporate VISA Card. On September 12, 2011 the Wholesale Debtor entered into that certain VISA Commercial Card Agreement with PNC establishing an "Active Pay Payable Card Program" (the "**Active Pay Program**") whereby PNC extends credit up to $1,000,000 to the Wholesale Debtor for 10 or more VISA Cards to be used solely for business purposes. As of the Petition Date, outstanding principal obligations under the Active Pay Program were approximately $ 166,073.90.

20. Collateral. A review of the PNC loan documents is ongoing. PNC asserts that the Letter of Credit Facility is secured by all personal property owned by the Wholesale Debtor. PNCEF asserts that the Equipment Finance Loan is secured by all equipment and other goods, all software and other general intangibles, and other property described in the loan agreement for the Equipment Loan Facility. PNC's collateral for the Corporate VISA Card is believed to be limited to the Wholesale Debtor's property in PNC's possession, including deposit accounts.

21. The unpaid aggregate obligations of the Debtors to PNC and PNCEF under the pre-petition credit facilities excluding accrued interest as of the Petition Date were approximately $10,716,448.

22. As of May 21, 2013, the Debtors had approximately $22.8 million of unsecured trade payables.

G. **<u>Events Leading to a Chapter 11 Filing</u>**

23. The Debtors were experiencing sales growth, were operating profitably and the future was bright and prosperous. However, the Debtors have been the victims of unfortunate circumstances.

24. Last week we learned that one of our customers, with multiple locations in Virginia, was accused of smuggling Virginia stamped cigarettes into New York. As part of this investigation, the U.S. Government on Thursday of last week seized the main operating account of the Wholesale Debtor at PNC to recover payments for merchandise made by the customer that was arrested, putting the company in the precarious position of not being able to access funds to run the day-to-day operations of the business. We had no knowledge that the account had been seized until the next day when we received notice from PNC that payments and wires we had initiated were being returned because our account had been frozen.

25. In reaction to the seizure warrant, PNC declared the Debtor in default of their pre-petition credit facilities and immediately terminated the Wholesale Debtor's line of credit.

26. After evaluating over the last 72 hours a number of strategic options as to how to best deal with the account seizure and the resulting default declared by PNC, the Debtors determined that the best alternative was to seek protection under Chapter 11 of the Bankruptcy

Code so that the Debtors can protect their assets while they reorganize their affairs under the provisions of the Bankruptcy Code.

## First Day Motions

## I. Procedural Motions

### A. Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases

27. The Debtors in these chapter 11 cases are affiliated entities. The Wholesale Debtor owns 99% of the Transportation Debtor, the remaining 1% is owned by the Management Debtor. The Management Debtor owns 2% of the Wholesale Debtor and I own the remaining 98% of the Wholesale Debtor. I am the sole shareholder and President of the Management Debtor. The Debtors request that, in light of the fact that Wholesale Debtor, Transportation Debtor and the Management Debtor have each filed petitions in this Court, the Court can and should jointly administer these chapter 11 cases. I believe that jointly administering these chapter 11 cases: (a) will ease the administrative burden on the Court and the parties; (b) will protect creditors of different estates; and (c) will simplify the United States Trustee's supervision of the administrative aspects of the chapter 11 cases. Accordingly, I believe that joint administration is in the best interests of the Debtors' estates.

B. **Debtors' Motion for an Administrative Order Pursuant to 11 U.S.C. §§ 105(a) and 331 and Local Bankruptcy Rule 2016-5 Establishing Procedures for Monthly Interim Compensation and Reimbursement of Expenses for Professionals**

28. In this Motion, the Debtors submit that the proposed procedure for compensating and reimbursing the professionals will enable the Court and all parties-in-interest to monitor professional fees and costs incurred more effectively and on a more current basis.

29. The procedure suggested in this Motion will enable the Debtors and all parties to closely monitor costs of administration, maintain a more level cash flow availability, and implement efficient cash management procedures. Moreover, these procedures will also enable the Court and key parties-in-interest to ensure the reasonableness of the compensation and reimbursement sought pursuant to such procedures on a more regular basis.

C. **Motion of Debtors for an Order Authorizing and Approving Maintenance and Use of Existing Bank Accounts; Use of Existing Books, Records, and Business Forms; and Continued Use of Existing Investment Guidelines**

30. By this Motion, the Debtors are requesting relief authorizing them to maintain and use their existing bank accounts at Wells Fargo Bank, N.A and Integrity Bank; existing books, records, and business forms; and investment guidelines. The Debtors are not seeking authority to maintain any existing accounts at PNC Bank, N.A. all of which will be closed by the Debtors after the Petition Date and the monies deposited into the Debtors other bank accounts.

31. Except for the accounts at PNC Bank, N.A. that will be closed, prior to the Petition Date, the Debtors maintained the following bank accounts (collectively, the "**Bank Accounts**"):

| DEBTOR | BANK | ACCOUNT NO. | USE OF ACCOUNT |
|---|---|---|---|
| Cooper-Booth Wholesale Company, L.P. | Wells Fargo | 200038441859 | Payroll Account |
| Cooper-Booth Wholesale Company, L.P. | Integrity Bank | 031318787 | Operating Account |

32. The Office of the United States Trustee's requirements are intended to provide a clear line of demarcation between pre-petition and post-petition transactions and operations and to prevent inadvertent payment of pre-petition claims. However, these requirements could cause substantial delay and disruption to the Debtors in the payment of their post-petition obligations and the conduct of their businesses.

33. In addition, no party in interest will be prejudiced or injured by the Debtors' maintenance of the Bank Accounts in the ordinary course of business. The Debtors strongly believe that if they were required to replace their existing Bank Accounts with new accounts as of the Petition Date, such requirement would unnecessarily disrupt the Debtors' businesses and impair their efforts to preserve the value of their estates.

34. The Debtors also submit that no party in interest will be prejudiced if the Debtors are authorized to continue to use their books, records, and forms substantially in the forms existing immediately prior to the Petition Date.

35. Because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession, changing business forms is unnecessary and unduly burdensome.

36. The Debtors submit that these efforts are prudent and sufficient to protect the interests of parties dealing with the Debtors on a post-petition basis, while avoiding

unnecessary expense and administrative delays at this critical time.

37. Additionally, the Debtors submit that "cause" exists for the court to allow the Debtors to continue investing and depositing their cash in accordance with their pre-petition cash procedures (the "**Investment Guidelines**"). The Debtors submit that the Investment Guidelines provide sufficient protection for their cash and that it would he in the best interest of Debtors, their estates and the creditors for Debtors to continue with these Investment Guidelines. The yield on investments under the Investment Guidelines will be greater than if the Debtors were restricted to direct investments solely in government securities. When considered in the context of the sums of money that are being invested, continued investment under the Investment Guidelines could result in greater returns for the Debtor's estate over time with little additional investment risk.

## II. Professional Retention and Related Motions

### A. Debtors' Application for an Order Approving the Retention of Maschmeyer Karalis P.C. as Bankruptcy Counsel Pursuant to 11 U.S.C. § 327(a)

38. The Debtors seek to retain Maschmeyer Karalis P.C. ("**MK**") as bankruptcy counsel pursuant to section 327(a) of the Bankruptcy Code as their attorneys because MK has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. In addition, I believe MK possesses extensive expertise, experience, and knowledge practicing before bankruptcy courts.

39. In preparing for its representation of the Debtors in these cases, MK has become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these chapter 11 cases.

40. I believe that the employment of MK is appropriate and necessary to enable the Debtors to faithfully execute their duties as debtors and debtors-in-possession, and to

implement the restructuring and reorganization of the Debtors. Accordingly, I believe that MK is both well-qualified and uniquely able to represent the Debtors in the chapter 11 cases in an efficient and timely manner.

**B. Application of Debtors to Employ and Retain Blank Rome LLP as Special Counsel Pursuant to 11 U.S.C. § 327(e) and 1107(a) and Fed.R.Bankr.P. 2014 and 2016**

41. The Debtors seek to employ and retain Blank Rome LLP ("**Blank Rome**") as special counsel pursuant to 11 U.S.C. § 327(e) and 1107(a) and Fed.R.Bankr.P. 2014 and 2016.

42. The services which Blank Rome will provide to the Debtors include, but are not limited to, providing advice and representation concerning the seizure warrant issued by the United States District Court for the Eastern District of New York, including negotiations with federal agencies concerning the seizure warrant.

43. Prior to the Petition Date, Blank Rome represented the Debtors in a law suit in which summary judgment was entered in favor of the Debtors and is presently on appeal.

44. Blank Rome has informed the Debtors that it will take all appropriate steps to avoid unnecessary and wasteful duplication of efforts by any other professionals retained in this case. The Debtors believe that the retention of Blank Rome as set forth herein will enhance and not duplicate the work being performed by MK.

**C. Application of Debtors to Employ Executive Sounding Board Associates, Inc. as Financial Advisors Pursuant to 11 U.S.C. §§ 327 and 328(a) and Fed.R.Bankr.P. 2014**

45. The Debtors seek to employ and retain Executive Sounding Board Associates, Inc. ("**ESBA**"), pursuant to section 327(a) and 328(a) of the Bankruptcy Code, to perform financial and restructuring advisory services for the Debtors in these chapter 11 cases.

46. The Debtors are familiar with the professional standing and reputation of ESBA. The Debtors understand that ESBA has a wealth of experience in providing

financial and related advisory services in restructurings and reorganizations, and enjoys an excellent reputation for the services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

47. In light of the size and complexity of these chapter 11 cases, the Debtors require the services of a seasoned and experienced financial advisor and one that is familiar with (i) the Debtors' businesses and operations and (ii) the chapter 11 process. Additionally, the Debtors believe that by having a financial advisor provide these services in these bankruptcy cases, other professionals in these cases and company officers who might otherwise handle complex financial and financing matters will be able to focus better on their respective competencies and their core tasks: to efficiently and effectively manage the Debtors' businesses and operations and to facilitate a successful chapter 11 process.

48. As a result of the prepetition engagement of ESBA by the Debtors, ESBA is familiar with the Debtors' business operations, capital structure, financing documents and other material information and is able to assist the Debtors in their restructuring efforts. The Debtors believe that ESBA is well qualified to provide its services to the Debtors in a cost-effective, efficient and timely manner. ESBA has indicated a willingness to act on behalf of the Debtors and subject itself to the jurisdiction and supervision of the Court. Additionally, the Debtors have been advised by ESBA that ESBA will coordinate with the other retained professionals in this bankruptcy case to eliminate unnecessary duplication or overlap of work. Accordingly, I believe that ESBA is well-qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner and that the employment and retention of ESBA would be in the best interest of the Debtors, their estates and creditors.

## III. Operational Motions

### A. Motion of Debtors for an Order Pursuant to 11 U.S.C. 363(c) and Fed.R.Bankr.P. 4001, Authorizing Debtors to Use Cash Collateral and Provide Adequate Protection

49. The Debtors require the ability to use cash and the proceeds of existing accounts receivable to maintain the operation of their business and preserve its value as a going concern. These essential items, however, constitute part of PNC's collateral and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with Section 363 of the Bankruptcy Code or the consent of PNC.

50. In accordance with Section 363 of the Bankruptcy Code, the Debtors request that the Court authorize the Debtors' use of Cash Collateral for an interim period, pending a final hearing on the Debtor's use of Cash Collateral.

51. The Debtors request authority to use cash collateral in the amount to be set forth on a budget which is being negotiated with PNC and will be submitted to the Court on or before the hearing date for the cash collateral Motion. The use of cash collateral is necessary in order for the Debtors to be able to operate and pay their post-petition obligations as they come due.

### B. Motion of Debtors for an Order (A) Authorizing the Debtors to Pay Certain Pre-Petition (I) Wages, Salaries, and Other Compensation, (II) Reimbursable Employee Expenses, And (III) Employee Medical And Similar Benefits; (B) Confirming that the Debtor May Continue Pre-Petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests

(i) Employees, Programs and Benefits

52. As of the Petition Date, the Debtor employed approximately two hundred and fifty (250) employees (the "**Employees**"). The Employees perform a variety of critical functions including customer service, purchasing, sales, credit, finance, accounting, human resources, delivery, dispatch, mechanical work, marketing, management, and other tasks. The

Employees' skills and their knowledge and understanding of the Debtor's operations, customer relations, and infrastructure are essential to the Debtor's business.

53. Just as the Debtors depend on their Employees to operate, the Employees depend on the Debtors. The vast majority of the Debtors' Employees rely exclusively on their compensation and benefits to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay them their full unpaid compensation, benefits, and reimbursable expenses in the ordinary course of business. To minimize the personal hardship that the Employees would suffer if pre-petition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce during this critical time, the Debtors, by this Motion, seek authority to pay and honor, in their sole discretion, certain pre-petition claims for, among other items: wages, salaries, commissions, and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums and taxes), health benefits, insurance benefits, vacation time, sick leave, life insurance, and all other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described below, the "**Employee Obligations**") and to pay all costs incident to the foregoing. In an abundance of caution, the Debtors request the right to modify, change, and discontinue any of its employee compensation programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during these Chapter 11 Cases in their sole discretion without the need for further Court approval.

(ii) Employee Obligations

a. Unpaid Compensation

54. In the ordinary course of business, the Debtors incur payroll obligations to the Employees. Such obligations generally comprise wages, salaries and commissions, but may also include expense reimbursement.

55. The Wholesale Debtor generally pays its Employees periodic payments for wages and salaries every Tuesday for the week ending the prior Saturday. However, in light of Memorial Day, the next payroll for the Wholesale Debtor is scheduled to be paid on Wednesday, May 29, 2013, instead of Tuesday, May 28, 2013. They are paid one week in arrears. The Employees who also receive a sales commission are paid this commission with their paychecks every week and bonuses are paid once every month.

56. The Management Debtor pays Barry Margolis one month in arrears on the fifteenth (15th) day of every month. On a prospective basis, the wages of Mr. Margolis will be paid on a weekly basis by the Wholesale Debtor along with all other employees.

57. On average, the Debtors have gross wage and salary expenses of approximately $248,000 every week. The gross commission expenses are approximately $23,700.00 every week. The Debtors process their own payroll. The Debtors are responsible for paying all the withholdings and payroll taxes (discussed below) to the applicable third parties.

58. Because all of the Employees are paid in arrears, as of the Petition Date, the Employees may not have been paid all of their pre-petition wages and compensation. Additionally, some Employees may be entitled to compensation because some checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have

cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date (the "**Uncashed Checks**").

59. The Debtors estimate that, as of the Petition Date, approximately $94,500.00 in pre-petition accrued wages, salaries, and commissions earned prior to the Petition Date remains unpaid (together with the Uncashed Checks and Reimbursable Expenses (as defined below) the "**Unpaid Compensation**"). As of the Petition Date, the Debtors believe that there may be uncashed payroll and employee reimbursement checks. The Debtors seek authority, but not direction, to pay the Unpaid Compensation, along with any costs associated therewith.

60. The Debtors submit that no employee has Unpaid Compensation in excess of the $12,475.00 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code. Accordingly, payment of Unpaid Compensation to the Employees would not violate the statutory priority afforded wages, salaries and other forms of compensation, but would merely accelerate its payment.

61. To the extent any other Unpaid Compensation exceeds the statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code, such payments would be de minimis. Nonetheless, the Debtors are not hereby seeking authority to pay any of the Employees on account of pre-petition accrued wage or benefit obligations in excess of the $12,475.00 priority cap.

b. Deductions and Withholdings

62. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums (collectively, "**Deductions**"). The Debtors

forwards the amount of the Deductions to the appropriate third-party recipients. Due to the commencement of the Chapter 11 Cases, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtors request authority, but not direction, to forward any unpaid Deductions to the appropriate third party recipients and to continue to forward these pre-petition Deductions to the applicable third party recipients on a post-petition basis, in the ordinary course of business as routinely done prior to the Petition Date. The Debtors also request authority, but not direction, to honor pre-petition checks associated with employee benefits.

63. Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withheld Amounts**"). The Debtors must then pay social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "**Employer Payroll Taxes**").

64. Prior to the Petition Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and the Employer Payroll Taxes (collectively, the "**Payroll Taxes**"), but such funds may not yet have been forwarded to the appropriate taxing authorities. The Debtors request authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties, and to continue to honor and process the pre-petition payments for Payroll Taxes on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

c. Honoring Checks for, and Payment of, Reimbursable Expenses

65. Prior to the Petition Date and in the ordinary course of their operations, the Debtors reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "**Reimbursable Expenses**"). The Reimbursable Expenses include (a) travel expenses for meals, hotels and rental cars, (b) business development expenses, (c) telephone expenses, and (d) other organization-related expenses that are paid by the Employees. As of the Petition Date, the Debtors have approximately $18,500.00 in pending requests for expense reimbursement. In addition, it is possible that certain Employees may have incurred pre-petition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date. The Debtors estimate that the amount of post-petition requests for reimbursement of pre-petition expenses will not exceed $24,700.00.

66. Reimbursable Expenses are all incurred on the Debtors' behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming Employees who may have incurred the Reimbursable Expenses, the Debtors request authority, to be exercised in their sole discretion, to (a) continue paying Reimbursable Expenses in accordance with pre-petition practices, (b) modify their pre-petition policies relating thereto as they deem appropriate, and (c) pay all Reimbursable Expenses that relate to the pre-petition period and are submitted to the Debtors post-petition.

(iii) Employee Benefits

67. The Debtors offer Employees the ability to participate in a number of insurance and benefits programs, including health care, vacation time and other paid leaves of absence, retirement savings plans, life insurance, programs and bonuses (collectively, the "**Employee Benefit Programs**").

a. Medical

68. The Debtors offer third party carrier health insurance to its Employees for medical coverage and co-pay prescription benefits (collectively, the "**Health Insurance**"). The Health Insurance coverage costs the Debtors approximately $600,000.00 per year. Only full-time Employees who have completed their sixty (60) day orientation and training period are eligible for Health Insurance.

69. By this Motion, the Debtors seek authority, in their sole discretion, to (a) continue the Health Insurance for its Employees in the ordinary course of business, (b) continue making contributions to such benefit programs, and (c) pay any amounts related thereto, including on account of any premiums, claim amounts, and administration fees to the extent that they remain unpaid as of the Petition Date.

b. Vacation and Other Leaves of Absence

70. The Debtors provide vacation time to its full-time Employees as a paid time-off benefit (the "**Vacation Time**"). The amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time accrued is generally determined by the Employee's length of employment. When an Employee elects to take Vacation Time, that Employee is paid his or her regular hourly or salaried rate.

71. The Debtors also allow their Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("**Leaves of Absence**"). Leaves of Absence include sick leave, family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves, and bereavement leaves. Employees are eligible for Leaves of Absence if they have been employed for at least twelve (12) months and worked more than one thousand two hundred and fifty (1,250) hours during the previous twelve (12) month period. The Debtors estimate that approximately

$175,000.00 of earned but unused Vacation Time and Leaves of Absence will have accrued as of the Petition Date.

72. By this Motion, the Debtors request that they be authorized, but not directed, to continue to honor their Vacation Time and Leaves of Absence policies in the ordinary course of business, and to honor and pay any pre-petition amounts related thereto. Moreover, the Debtors anticipate that their Employees will utilize any accrued Vacation Time and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

(iv) Employee Savings and Retirement Plans

73. The Debtors maintain a traditional 401(k) retirement plan meeting the requirements of the Internal Revenue Code for the benefit of Employees (the "**Retirement Plans**"). The Retirement Plans allow for deductions of eligible compensation up to the limits set by the Internal Revenue Code. Employees who have completed one year of employment, one thousand (1000) hours of service, and who are twenty-one (21) years of age may participate in the Retirement Plans. The Employee's Retirement Plan contributions are approximately $5,300.00 every week. The Debtor matches the Employees' contributions up to the sum of $900.00 per week.

74. By this Motion, the Debtors seek confirmation that they may continue the Retirement Plans in the ordinary course of business, and requests authority to pay any amounts owed as of the Petition Date. The Debtors estimates that as of the Petition Date, the sum of $5,200.00 must be forwarded to the Retirement Plans.

(v) Additional Employee Benefits

a. Life Insurance

75. The Debtors provide their Employees with primary life insurance and accidental death and dismemberment insurance coverage. This coverage is available to full time Employees who have finished their sixty (60) day probation period. This coverage costs the Debtors approximately $4,150.00 per year.

b. Programs and Bonus Plans

76. The Debtors allows their Employees to take part in purchase programs whereby the Employees can purchase items at reduced costs. The Debtors also provide safety and attendance bonuses to their hourly office Employees in the maximum amount of $15.00 per month and their warehouse Employees in the maximum amount of $30.00 per month. These bonuses cost the Debtors approximately $2,100.00 per month

**D. Motion for Entry of Interim and Final Orders: Prohibiting Utility Companies from Discontinuing, Altering or Refusing Services; (II) Deeming Utility Companies To Have Adequate Assurance of Payment; and (III) Establishing Procedures for Determining Requests for Additional Assurance Pursuant to 11 U.S.C. § 366**

77. In connection with the operation of their businesses, the Debtors obtain electric, water, telephone, internet and other similar utility services provided by a number of utility companies (the "**Utility Companies**").

78. Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtors' operations. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, their enterprise value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

**F. Motion of the Wholesale Debtor for Entry of an Order Authorizing the Debtor to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto**

79. To maintain its market share in its industry, the Wholesale Debtor has dedicated extensive time and resources to developing a number of programs (collectively, the "**Customer Programs**") to develop goodwill with its customers. The Wholesale Debtor believes its Customer Programs have been successful business strategies—the costs of the Customer Programs are largely offset by the revenue generated therefrom—and such programs play a critical role in the purchasing decisions of customers. As a result of the Customer Programs, the Wholesale Debtor has established strong loyalty among its customers.

80. As such, it is crucial to the Wholesale Debtor's operations and going concern value that it is able to retain the loyalty, confidence and goodwill of its customers. Indeed, the Wholesale Debtor believes it will be impossible to maintain its customer base unless it is authorized to continue its Customer Programs and honor its customer obligations in the ordinary course of its business. Accordingly, by this Motion, the Wholesale Debtor is seeking to assure its customers that, despite commencing this Chapter 11 Case, the Wholesale Debtor will nevertheless continue to operate business consistent with past practice and with the same level of reliability and integrity for which they are well known.

81. The Customer Programs, which the Wholesale Debtor implements and modifies from time to time in the ordinary course of business, can generally be categorized as follows:

a. If a customer chooses to purchase products exclusively from the Wholesale Debtor, they may be eligible to receive program payments on purchases according to agreed upon "program schedules". The program schedules may change during the term of the

agreement, and may be affected by increases in wholesale prices, taxation, and other market factors.

b. Under the Wholesale Debtor merchandising program, a customer may receive two payments, a monthly payment (the "**Monthly Volume Growth Rebate**") and a quarterly payment (the "**Quarterly Volume Enhancement**"). Some programs do not include the quarterly portion. Each payment is based on the level of total monthly purchases from the Wholesale Debtor. The customer may also be eligible to receive an "off invoice" discount on all non-cigarette products purchased from the Wholesale Debtor providing they are using the Wholesale Debtor exclusively.

c. For a customer to be eligible to receive payment from these programs, they must use the Wholesale Debtor exclusively as their convenience store products supplier and must enter into an agreement with the Wholesale Debtor in a form specified by the Wholesale Debtor.

d. When determining the "Monthly Purchases from the Wholesale Debtor" for purposes of calculating the "Quarterly Volume Enhancement" payment, the Wholesale Debtor will average the monthly sales during the quarterly period. The amount that a customer receives from these programs will depend entirely on the amount of purchases made from the Wholesale Debtor. The customer must also agree to certain terms and conditions to be eligible for our merchandising program.

82. By this Motion, the Wholesale Debtor requests authority to honor these pre-petition programs on a post-petition basis.

### G. Motion for an Order Extending Debtors' Time to File Schedules and Statements of Financial Affairs Pursuant to Fed.R.Bankr.P. 1007(c)

83. Prior to the Petition Date, the Debtors and their professionals have focused on

numerous tasks relating to these Chapter 11 cases, including: (a) reviewing documents, (b) analyzing the Debtors' cash flow projections; (c) addressing issues relating to the Debtors' various financial obligations; (d) negotiating with PNC and other parties to obtain alternative financing; and (e) preparing the Debtors' various "First Day Motions". In addition, the Debtors' combined have in excess of two hundred and fifty (250) creditors.

84. As a result, the Debtors and their professionals have yet to complete the Schedules and SOFA and anticipate that such documents may not be completed by the 14 day deadline established by the Bankruptcy Rules. Rather than filing incomplete schedules, I believe obtaining an extension of time is warranted and will afford us adequate time to file the Schedules and Statements of Financial Affairs.

Date: May 21, 2013

By:______________________
Barry Margolis

# EXHIBIT "A"

Cooper Booth Wholesale Company
Historical Income Statement (LIFO Basis)
For the Years Ended

| | 12/31/09 | 12/31/10 | 12/31/11 | 12/31/12 |
|---|---|---|---|---|
| Net Sales | 456,664,598 | $ 509,923,877 | $ 549,793,940 | 614,955,005 |
| Cost of Sales | 435,792,816 | 490,733,527 | 532,077,492 | 597,035,180 |
| Gross Profit | 20,871,782 | 19,190,350 | 17,716,448 | 17,919,825 |
| Other Operating Income | 1,640,639 | 1,632,647 | 1,677,998 | 1,922,384 |
| Operating Expenses | 16,945,579 | 14,932,813 | 14,996,978 | 17,979,704 |
| Net Income from Operations | 5,566,842 | 5,890,184 | 4,397,468 | 1,862,505 |
| Other (Income) Expense | | | | |
| Interest Expense | 208,673 | 170,984 | 159,569 | 161,571 |
| Interest Income | (6,653) | (8,366) | (7,590) | (6,814) |
| Other (Income)/Expense | 202,020 | 162,618 | 151,979 | 154,757 |
| Net Income (Loss) | 5,364,822 | 5,727,566 | 4,245,489 | 1,707,748 |
| Less: Net Income Attributable to Non-Controlling Interest | (259,146) | (281,381) | (307,429) | (331,239) |
| Net Income Attributable to Wholesale and Transportation | $ 5,105,676 | $ 5,446,185 | $ 3,938,060 | $ 1,376,509 |
| | | | | |
| Key Ratios: | | | | |
| Sales Growth | | 11.66% | 7.82% | 11.85% |
| Gross Profit Margin | 4.57% | 3.76% | 3.22% | 2.91% |
| Operating Expense/Sales | 3.71% | 2.93% | 2.73% | 2.92% |
| Net Income/Sales | 1.17% | 1.12% | 0.77% | 0.28% |
| Net Income Attributable to Wholesale and Transportation/Sales | 1.12% | 1.07% | 0.72% | 0.22% |

Note: FYE 2012 results are unaudited.